We'll hear argument next in Case 17-1229, Helsinn Healthcare v. Teva. Mr. Chamnagam. Thank you, Mr. Chief Justice, and may it please the Court. In the America Invents Act, Congress transformed the nation's patent laws. As part of its shift from a first-to-invent to a first-to-file system, Congress revised the definition of prior art and clarified the proper understanding of the phrase on sale. The on-sale bar, like the other bars in the definition, reaches only a disclosure that makes the claimed invention available to the public. That interpretation is consistent with the plain text of the definition and its legislative history. It's consistent with the predominant objective of the on-sale bar, as repeatedly articulated by this Court, namely, to preserve the public's access to inventions that have entered the public domain. Well, it might not be consistent with the actual meaning of the word sale, though, right? The critical phrase You're having, if you're, if something's on sale, it doesn't have to be on sale to everybody. It could be just, I'm going to sell something to you. Well, the critical phrase, Mr. Chief Justice, is not sale. It is on sale. And I do think that the more natural understanding of on sale is that something has been made available for purchase by the public. And so, for instance, if after this argument in the lawyer's lounge, I turn to my friend, Mr. Jay, and I say, I see that you didn't bring a coat for $5,000. I'm not sure that that would be putting my coat on sale in the same way that it would be if I turned around to the audience and said, I'll sell this coat to the highest bidder. Why not? I don't, and if it's sold, it's pretty hard to say something that has been sold was not on sale. I think that the concept of on sale, Justice Kavanaugh, conveys some sense of broader availability, or at a minimum, that there's some ambiguity about that. That is to say, I think I'm willing to recognize that perhaps you could make the argument that even offering something privately to one person could be said to be putting something on sale. Our view as a textual matter is that to the extent that there's any ambiguity ---- Isn't it always the case that if you offer it to even one person or to a small group of people, it's on sale? I think that I would ---- I guess I'm not understanding that. I think I would say, Justice Kavanaugh, that something can be on sale regardless of how widely it is in fact sold. So for instance, if you put something in the shop window and no one in fact wants to buy it and no one in fact buys it, it can still be on sale. But again, to the extent that there's any doubt about the phrase on sale in vacuo, I think that that doubt probably was eliminated before the AIA by the surrounding phrases, all of which, by Respondent's recognition, convey some notion of public availability. And then any lingering doubt was completely removed by the inclusion of the catch-all phrase in the AIA. Breyer. You said that the opinions of this Court support you, but of course you know perfectly well, as we only have Justice Story, Learned Hand, and I guess various others, maybe John Marshall, for all I know, who has said that that isn't the sole purpose, that the purpose of this on-sale rule, including private sales, is to prevent people from benefiting from their invention prior to and beyond the 20 years that they're allowed. And that's the so I read that, I had my clerk look it up, seems right. Justice Breyer, Respondent's whole argument before this Court, I would respectfully submit, is really a junior varsity version of congressional ratification. No fewer than six times in their brief, they refer to the two centuries of precedent. I would respectfully, vigorously disagree with that, particularly with regard to this Court's decisions. And let me get to Judge Hand, but let me start with this Court's decisions, starting with Justice Story's opinion in Penick. This Court has consistently articulated the predominant purpose of the on-sale bar as preserving the public's access to inventions that have entered the public domain. Indeed, if you go back to Penick, Justice Story, at a time when the on-sale bar was not yet codified in the statute, articulated the purpose in precisely that term, both with regard to the public use bar and with regard to the on-sale bar. He said if the inventor shall put the invention into public use or sell it for public use before he applies for a patent, this shall furnish another bar to his claim. And all the way through to this Court's decision in Pfaff, this Court has referred to, quote, the reluctance to allow an inventor to remove existing knowledge from public use, and has said that that purpose undergirds the on-sale bar. Breyer. Doesn't commercial exploitation also undergird the bar? I don't think we would dispute that that is one way of characterizing the underlying purpose, and that is what Judge Hand said in the metalizing opinion. But of course, that can all be secret. It's not very hard to have an invention that is practical. Well, I'm looking at the word practice, and it's not just one word. It's also practicing the invention. And you can practice the invention in such a way that the user of the invention can't find out what the invention is. That's not uncommon. Let me say — And therefore, do we have two that do not involve the public awareness of the invention itself or how it is produced? So let me say just one last thing about this Court's decisions and then address that concern directly. I think that if you were to adopt our interpretation under which public availability is required to trigger the on-sale bar, just like all of the other bars, you would not have to discard any of the reasoning of this Court's cases, and you wouldn't have to change any of the outcomes of this Court's cases. We believe that all of this Court's cases on their facts would come out the same way. Now, with regard to this alternative formulation of the purpose, which I think really first appeared prominently in Judge Hand's opinion in metalizing and then did get picked up in a couple of this Court's decisions, I'm willing to accept that when you have a sale, there is obviously a commercial aspect to that. The person who sells the item receives some consideration in response to that. But I don't think it's fair to say that what Judge Hand was doing was saying that the on-sale bar reaches all forms of prepatent commercialization. I think that that is an over-reading of the on-sale bar. And I think that, critically, even our interpretation of the on-sale bar obviously substantially limits an inventor's ability to profit from his or her invention, because if you do have public availability and a sale, that is still going to be prohibited. Our submission is simply that the statute ---- Ginsburg, would you please clarify one thing? I thought that one argument was that the AIA changed the way it was, but your definition of on-sale seems to apply. You seem to say there was no change. On-sale never included the secret sale. Justice Ginsburg, as I said at the outset, I think that what Congress did in the AIA was to clarify the proper understanding of the phrase. And I do think that at least our argument concerning the Noskotura Soka East canon would still have applied even before the AIA. Obviously, we have the addition of the catch-all phrase. And I think under this Court's decisions construing materially identical language, catch-all provisions do shed light on the meaning of the categories that precede them. But in our view, in terms of what the ---- If that was a clarification, it was a terrible clarification, because there were a lot of efforts, as you well know, to actually change the on-sale language, and those all failed. I think, in fairness, Justice Kavanaugh, I would say that this was exactly the way to achieve Congress's dual objective. You don't think it would have been easier to just change it directly, as many members of Congress tried to do repeatedly and failed? I think that that is, with respect, an overstatement of what members of Congress tried to do. I think that at most, as Respondents point out, there were bills that would have deleted public use and on-sale from the definition. But I think that there was good reason, actually, to retain those phrases, as the  terms, which Congress may have wanted to retain, things like the ready for patenting requirement. Retaining those phrases also made clear that where the inventive embodiment is in the public domain, the statute reaches those cases no differently from when the inventive idea is in the public domain. What Congress was trying to do in the catch-all provision, and the House and Senate reports, the most definitive form of legislative history, bear this out, was to achieve two objectives, to make sure that they reached all forms of prior art, such as oral presentations, PowerPoint presentations, and the like, and also to clarify that any form of prior art must be publicly available. And notably, and this gets to Justice Ginsburg's question about whether there was a change in the law, I do think that what Congress was doing was abrogating some of the outlying lower court decisions that had extended both the on-sale bar and the public use bar to cases where there was not public availability. And indeed, the legislative history identifies by name some of the public use cases that had so held, cases like the Beachcombers decision from the Federal Circuit and the jump sport decision. We also point to some of the on-sale cases that had extended to sales that did not involve public availability, cases like special devices and Kavanagh. And I think, Justice Kavanaugh, that that's precisely why you should think that what Congress did here was fit for purpose. I think we would certainly acknowledge that Congress could have modified the language of on-sale, but what Congress wanted to do, we would respectfully submit, was also to fix some of this outlying Federal Circuit case law on public use. Now, of course, that phrase public use, one might think, would have inherently conveyed some notion of public availability, as Respondents themselves suggest in their brief. But at the same time, you had the Federal Circuit extending the public use bar to circumstances in which inventions were displayed in private parties. The jump sport case involved a trampoline in the inventor's backyard. These were cases where, in our view, there would not have been public availability. And so Congress, in including the catch-all provision, did what Congress did in cases like C-Train lines and Paroline. It shed light on the meaning of the preexisting specified provisions. And to be sure, in those cases, everything was enacted at the same time. But as a textual matter, you have to read the statute as a whole. And again, Respondents' argument here really rests on this notion of congressional ratification. The first part of that is the part that I've already addressed, this notion that there was some settled body of law saying that you don't have to have public availability. And not only did this Court never say that, this Court never did that. But of course, the second component of any congressional ratification argument is that you have to have statutory language that was not changed. And this provision was dramatically revised. And to be sure, some elements of the pre-AIA definition, including the phrase on sale, were retained. But at the same time, Congress added the catch-all phrase. It defined a claimed invention. And of course, it shifted to a first-to-file system, which largely addresses this concern about improper commercialization. Because of course, any inventor who engages in commercial activity without applying any first-to-file system runs the risk that another inventor will beat them to the patent office. And that is a concern I would respectfully submit that is particularly acute in a context like this. On the first part of what you just said as to what the law was, the amicus brief, the Lemley amicus brief, says the law has always treated secret sales and uses as prior art. Are you disagreeing with that? I am disagreeing with that. And again, in our view, and the government can offer its view with the institutional heft of the patent office, there is no decision of this Court that would have to be disturbed. In our view, there are a handful of Federal Circuit cases that would come out differently if a public availability requirement is applied. And I want to say one more. Breyer, in Benita Boats, this Court, while it isn't necessary for the holding, does, quote, learn at hand, and it does say it is a condition upon the inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting. He has to go ahead and patent it or keep it a secret forever. So an inventor, who in fact in year one has his invention ready for patenting and goes around from one person to another, secretly selling it to each with a confidentiality agreement, is a person who is exploiting his agreement, his invention, and therefore, since he didn't do it through a patent, he loses the right for a patent. That seemed to me the clear, pretty clear rationale of learn at hand, of why the Court did that in Benita Boats, of why Justice Story said what he said. And I think it's that that the Lemley brief was relying upon when they made that statement. We are not disagreeing that that can be fairly read to be a purpose of the on-sale bar. My submission is a much more modest one. It is that in order to accept Respondent's submission, you have to think that the on-sale bar really pursues that purpose at all costs. And part of the reason why we know that that is not true is because Respondents themselves concede that if this arrangement had been structured slightly differently, if this had been structured as a right to profit sharing rather than a structure where you have up-front payments followed by payments per unit for any eventual product, if there even is one. Breyer, can we accept that point and write something in your favor on that? That is, that there is a question of what is on sale. It's not the public-private question. There are experimental exceptions, for example. And perhaps there should be other, if not exceptions, at least care taken to be certain that it is an exploitation of the invention when it is a private sale. I mean, to go that far seems consistent with what we have previously said and what they say with the exceptions in the statute. It's where you want much more than that, really. You've read the Lemley brief. I've read the Lemley brief. I've read these briefs. Fisherman, I don't think we want much more than that. We might suggest respectfully that the opinion be written slightly differently. I mean, I think that we think that this Court should correct the Federal Circuit's error, which is to say that public availability is not required. Now, Respondents, we believe, have forfeited any argument that there is public availability here, but we also think that this would be an easy case under a public availability requirement, both because this involved a sale to a single distributor, MGI, that was under an obligation of confidentiality, and also because this was a development arrangement of which distribution was an eventual possible part. There was not even a product at the time of this arrangement. And so we certainly think that this would be an easy case under a public availability requirement. I'd like to reserve the balance of my time for rebuttal. Thank you. Roberts, Thank you, counsel. Mr. Stewart.  Stewart. Mr. Chief Justice, and may it please the Court. In the government's view, there are two basic reasons that the transaction at issue here shouldn't be held to trigger the on-sale bar. First, MGI was not a company that intended to use the drug for its — that planned to use the drug for its intended purpose by administering it to patients. MGI proposed to function as a financial intermediary that would take title to the palinocetrine, but ultimately would resell it. And second, even as to MGI itself, the transaction did not provide any assurance that title would ultimately pass because the terms of the deal were subject to various contingencies. And I'd like to focus on the first point first. None of the Court's decisions in either the public use or the on-sale bar, holding those bars to apply, have dealt with situations involving distribution intermediaries. All but one of those cases have involved fact patterns in which the invention was actually out there in the world being used for its intended purposes, and that was what was held to trigger the on-sale or the public use bar. The only exception to that is FAF, because FAF involved an offer for sale that had not yet been consummated, and the Court held that the bar was triggered, even though the invention had not yet been supplied. But even in FAF, you had a firm offer to Texas Instruments that proposed — that intended to use the component for its ultimate purposes, to be incorporated into larger machines. You didn't have an entity that intended to buy the product solely for resale. And I think in terms of how do we usually understand phrases like on-sale or available to the public, our reading really conforms much more closely to usual public practices. That is, if you imagine a situation with a new product like an iPhone, it's manufactured, it's sold to a wholesaler, the wholesaler sells it to a retailer, and then the retailer sells it to consumers, there's a train of transactions that constitute UCC sales. But if you ask an ordinary speaker of the language, at what point did the iPhone go on sale or become available to the public, you would say that it's when consumers could buy it, when the people who plan to use the phone for its intended purpose — JUSTICE SOTOMAYOR — in the industry to distributors, they'll say the moment that Apple was going to start shipping it to distributors. That I didn't win is irrelevant to me. It was on sale the moment distributors were going to pick it up and ship it out. MR. CLEMENT You might use a phrase like on-sale to distributors or on-sale to resellers, but I don't think you would use the phrase on-sale standing alone. And it would certainly be odd to describe the phone as being made available to the public at the time that Apple was accepting bids as to whom — JUSTICE SOTOMAYOR — This definition of on-sale, to be frank with you, I've looked at the history cited in the briefs, I've looked at the cases. I don't find it anywhere. You're sort of giving on-sale to the public its meaning, but those are not the words used by Congress. Congress could have said on-sale to the public, and then we might have to grapple with this. Congress just said on-sale. MR. CLEMENT It retained the phrase on-sale, but it added the phrase or otherwise available to the public, and that served two purposes. It functioned as a catch-all so that things that were not enumerated might still constitute prior art, but it also served the purpose of clarifying that the preceding enumerated categories were different ways of making the invention available to the public. And as we pointed out in the brief, the on — JUSTICE SOTOMAYOR — Isn't that the feature of your argument? MR. CLEMENT I'm sorry? JUSTICE SOTOMAYOR — If that phrase has an independent meaning, and you've just given it to, then why don't we take the words Congress used with their history? Because they didn't say on-sale to the public, they just said on-sale, and when you have a historical term that has a history, as a matter of course, we look at that history.  CLEMENT I think it's certainly appropriate to look to the Court's — to the history in particular, to this — particularly to this Court's prior decisions. And if this Court had previously held the on-sale bar to be applicable to sales to distribution intermediaries, then we might say this is a fairly oblique way of overturning those decisions. Our key point is this Court's — KAGAN If you assume for a moment that the law was pretty settled before the AIA, then do you think that the AIA would — that the language added in the AIA would have been capable of flipping that settled law? CLEMENT If you thought it was settled by this Court's decisions that the on-sale bar applied to this law — KAGAN How about if I say it was settled because this Court had decided FAF, and because the Federal Circuit had a number of cases? CLEMENT I don't think that's sufficient to treat the law as settled, especially because there is evidence, both from the face of the statute, the fact that otherwise available to the public was added, also from the legislative history, that Congress was attempting to clarify that the enumerated terms were ways of making the invention available to the public. I mean, the other thing I would say to follow up on something that my colleague mentioned is that one of the justifications for the on-sale bar traditionally has been prevent the inventor from profiting before he is ready to put his invention up for patent. And that justification is neither sufficient nor necessary on Respondent's view of the case. That is, as Mr. Chamigan pointed out, Respondents themselves agree that there are other transactions by which Helson could have gotten money up front, could have gotten seed money in return, for instance, for promising a share of the profits. Those would not have triggered the on-sale bar. The other thing is that in the Federal Circuit's decisions, it's not even necessary that the inventor profit from the sale in order for the on-sale bar to apply. The Federal Circuit has confronted fact patterns in which the inventor will ask an outside supplier to produce physical embodiments of the invention and deliver those to the inventor. Obviously, the inventor is not profiting from that. The inventor is paying money for the production. And the Federal Circuit has said that triggers the on – that at least potentially triggers the on-sale bar because it is a UCC sale. Kagan. Kagan. So, Mr. Stewart, I'm going to ask you to accept my assumption, and it's a big assumption, I realize that. But just accept the assumption that the law was settled prior to the AIA and it was settled Mr. Jay's way, not your way. Then is the new language that the AIA put in the statute, would that be enough to unsettle it? Stewart. No, I think that would be a fairly oblique way of attempting to overturn kind of a settled body of law. But as I say, the body of law that the Federal Circuit has developed doesn't map on to any policy justification. The other thing I would say about FAF is that in FAF, the Court emphasized that the sale was what it referred to as a commercial sale rather than an experimental sale. And the Court at some length discussed the body of cases involving the experimental use doctrine. And the — I'm sorry, Justice Kavanaugh? Go ahead. And the Court has recognized that even when an invention is being used out in the public square in a manner that is visible to the public, it's not the sort of public use that triggers the public use bar if it is being done for experimental purposes to verify that the invention will work as a stage precedent to patenting. And the Court in FAF strongly indicated if a sale is made so that the buyer can engage in experimentation rather than to use the product to achieve its intended benefits, that won't trigger the on-sale bar. You mentioned the legislative history, but here, isn't this a classic example of trying to snatch victory from defeat in some of the legislative statements? In other words, there was this law before, as Justice Kagan mentions, a huge effort to change it, lots of proposals to change it. They all fail, and then a couple statements set on the floor on which you're relying. I think the legislative history read as a whole goes exactly contrary. Well, to answer that, let me point to one of the things — What's wrong with thinking that way? I think what's wrong with thinking that way is that, as we've pointed out in our brief, the prior art provision encompasses two conceptually distinct ways of placing an invention in the public domain. If the invention is patented or described in a printed publication, that means that the inventive idea has been made available to persons skilled in the art such that they would be able to make it. And the on-sale bar and public use bars deal with situations in which physical embodiments of the invention had been placed in the public domain. Now, some of the proposals that you refer to, Justice Kavanaugh, would have said things to the effect of — it has been patented, described in a printed publication or otherwise available to the public. I think if that language had been used and there had been no reference to on-sale or public use, it would have been at least a permissible inference that the otherwise available to the public referred solely to circumstances in which the inventive idea had been disclosed. And that would have — that really would have overturned a great deal of this Court's law concerning the on-sale and public use bars, because those can be triggered even if the public is not aware of how the invention works, so long as physical embodiments have been made available. So I think Congress got the best of both worlds by clarifying that all these things have to be public in some manner, but also clarifying that making physical embodiments available is sufficient. Thank you, Mr. Stewart. Mr. Jay. Thank you, Mr. Chief Justice, and may it please the Court. A product that is sold or offered for commercial sale is on sale, as this Court has consistently read that term. That established meaning didn't change when Congress added a new category of invalidating prior art to the statute. That's events that make the invention available to the public in other ways not already covered by the statute. So Helson's argument, as you've heard this morning, is that although it sold its invention, that sale did not place the invention on sale. We submit that not only did Helson place the invention on sale, it also made the invention available to the public. But I'd like to begin with first the plain meaning of on sale. We think that the reason that the statute uses on sale, and this Court has always read it this way, including in FAF, is to cover offers for sale. If it just — if the statute simply said sales, then it wouldn't cover offers. And offers are important for two important — for two key reasons. One, an offer shows — the willingness to place the invention on sale, to make an offer to sell the product, shows that the inventor is ready to commercialize the invention. And if they're ready to commercialize the invention, and then the second half of the FAF test is met, the invention itself is ready for patenting, then the inventor ought to be going to the patent office and applying for a patent. If instead the inventor wants to commercialize the invention, deriving profit from it, then the inventor can do that, but should not expect a legal monopoly that could extend past the statutory term. Alitoson Well, I think the most serious argument you have to deal with is the meaning — the plain meaning, the fairly plain meaning of the new statutory language. So you say on sale means on sale publicly or on sale privately, right? Gershengorn Right. On sale, period, full stop. Alitoson Okay. So suppose that the statute had been amended to read just the way it does, except — so it would — with one exception. So it says, the — the Claremont invention was patented, described in a printed publication or in public use, on sale publicly or on sale privately or otherwise available to the public. That would be nonsense, wouldn't it? Gershengorn I think it would be confusing. That's certainly right. But I do think that it would specify that one of the categories of invalidating prior art would be on sale privately. And in your hypothetical, I think this Court would give effect to the choice that Congress made, even though one of the items in the list might stick out somewhat and not — Alitoson It would be nonsense, because the meaning of otherwise is in the same — in some other manner, to do the same thing in some other manner. And you have — what we have now, after this change, is an enumerated — is an enumeration of a number of things that are public, a printed publication, in public use, two things that are obviously public. Then we have on sale. And then it says, or otherwise available to the public. And I find it very difficult to get over the idea that this means that all of the things that went before are public. So two points. Alitoson That's what otherwise means. Jay So, of course, you know, Your Honor sort of asked me to assume that this is a statute that's being written from scratch, and I think that that takes off the table all of the history of the statute as it was before 2011. But second, even taking — even taking that off the table and looking at the statute — a statute like the one that you've proposed, the reason that your example is different from this statute is that in your example there's one category, on sale privately, that doesn't even have any overlap with available to the public. Now, we've never disputed that many sales do, in fact, make inventions available to the public. But we do think that on sale has its own meaning. And one important part of that meaning is offers. And we think that structurally, if on sale is to include offers, and we think there is no way to read that definition to exclude offers, offers are not generally going to make an invention available to the public. My friends on the other side, in their brief, suggest that that might happen in a newspaper advertisement, but it's extremely unusual to see in a newspaper advertisement all of the details of a claimed invention disclosed. So we think that the function of otherwise in the statute as amended, again, even taking off the table all of the history, is to acknowledge that there is overlap between the previous four categories and the new category of invalidating prior art that's being added, so as to make sure that the new category doesn't swallow or change the meaning of a prior one. Let me illustrate that with an example. Alito, do you agree that the new category consists of offers? The new category consists of things that make the otherwise make the invention available to the public. And what would be within that category? An oral presentation at a conference without slides, you know, PowerPoint slides that get distributed. That's one example. Another that's discussed in the Hitech Inventors Alliance brief is collaboration  indexed and would not count as a printed publication, but ought to be the kind of disclosure. I mean, the government agrees with us, and I think by the end of the briefing, Respondent or Petitioner has agreed with us, that this new category's primary function is to create new invalidating prior art disclosures that weren't invalidating before the AIA. And we think that it would be strange for Congress, by creating a new invalidating category, in other words, narrowing the scope of things that could be patentable, to indirectly, and by the strangest implication, narrow a category of prior art and widen the scope of things that could be patented. I think it's, as a historical matter about this case, I think it's important to understand that Petitioner had gotten three patents before the AIA, and all of which were invalidated below. And Petitioner hasn't sought cert on that, and he told this Court at page 3 of the reply brief that it could assume that that decision was correct under the prior interpretation of the AIA. I'm sorry, on sale, yes. Sotomayor, you were cut off before you gave an example. I wasn't quite moved by your baseball example. So do you have something else, and something that's based in law, where otherwise was used in the way you suggest? And the second part of my question is, will we be the only country that has a first-to-file system that includes private sales? So let me answer the second part first. Confidential. Just because I think it's a pretty straightforward answer. The on-sale bar itself is unique. The other countries don't have an on-sale bar that includes public sales. They just don't have an on-sale bar at all. So the other countries don't have an on-sale bar at all. I'm sorry, explain that to me. An on-sale. No, there is no on-sale bar, public or private. Right. Sales are not a category in the other countries' patent systems that are just discussed in the briefing. The point made is that those countries don't rely on secret prior art, but they also don't have an on-sale bar at all. So in this country, we have, and Congress has decided to retain, a category of invalidating prior art that has as the purpose measuring whether the inventor is commercializing the invention, is ready to commercialize the invention, an invention that, under the second half of the test, is ready for patenting. So that is itself somewhat unique, and I think that's the answer to why you don't see this in other countries. On the first question you asked, Your Honor, what I was getting to with Justice Alito about the addition of otherwise available to the public rather than just available to the public, we think the word otherwise serves to acknowledge that there is overlap and to avoid this strange situation. So if the statute had said, described in a printed publication, dot, dot, dot, or available to the public, one implication of that might be, if there weren't a clarifying word like otherwise to make clear that that new category was a residual category intended to catch things not already caught, the implication might be that, well, gosh, in order to give content to the other items in the list, we'd better read them to include things that are not available to the public, such as printed publications that are not indexed and are not available to the public. There is an extensive body of law on that. So, for example, a Ph.D. thesis that's on a shelf somewhere but is not indexed and not readily findable does not count as a printed publication. We think that the best reading of this new category is that it creates a new set of invalidating prior art, and it does not unsettle any of the prior categories, whether patented, described in a printed publication, in public use, or on sale. And it certainly doesn't disturb the basic policy justification for the on-sale bar, which deals not with the stock of public knowledge, precisely because, as my friend, Mr. Shamagam, and my friend, Mr. Stewart, have both discussed, putting an embodiment out in the public, or even offering to put an embodiment of the invention out in the public for money, meaning on sale, that may not tell the public anything about how the invention works. Breyer. Can you answer Justice Alito's and Justice Sotomayor's first question? That is, I can think of examples, but they're a little awkward. I mean, the meat, the sports meat will include football, basketball, running, swimming, or otherwise, or games that otherwise involve a ball. Okay? Or breakfast, a healthy breakfast includes Fiber One, Bran Flakes, fruit, tea, and food that otherwise is a, what do you, a fiber heavy. But each of those is somewhat awkward, each of the ones. So it's possible, among these excellent briefs, I thought the bar really earned its pay on both sides. But I mean, the, I couldn't come up with a good English example there. So I thought, maybe, maybe you have. So I actually, and thank you, Your Honor. The example that we thought of actually is very close to your football, baseball, swimming example, and I think in particular that if a statute said, you know, don't engage in football, baseball, or swimming, full stop, I think everyone would understand what football and baseball and swimming meant. And if the statute were then amended to add, or any other activity that involves the use of a ball, that might be a bit awkward, but no one would think that it changed the meaning of swimming, that it required the adoption of an atextual meaning of swimming that doesn't appear in any dictionary, or that it required anything other than the additional meaning of nonsense. Kagan. I'll give you another one, Mr. Jay. So suppose I say, don't buy peanut butter cookies, pecan pie, this is the key one, ready, brownies, or any dessert that otherwise contains nuts. Do I violate the injunction if I buy nutless brownies? So I think that the reason that that hypothetical, so I think I would say no. Do I violate the injunction if you? In other words, can I buy nutless brownies? I think you can, and I think that the reason for that is that brownies is a term that might or might not be read to include brownies with nuts or brownies otherwise. But I don't think that you have that permissible reading of on sale here. You're saying it's not even like a little bit doubtful what on sale means? Certainly not by the time the AIA was enacted. No, I don't think that it was. I don't think that it was doubtful by any dictionary that we found either when the bar was enacted or when it was recodified in 1952 or when it was reenacted in 2011. So no, I don't think it's a permissible reading. And in your region, but Mr. Kagan's excellent brief, he's certainly seems to think that on sale means something different from what you thought it meant. And I guess what my hypothetical is designed to do is to say, look, let's take a term that could be read one way or the other, and then let's attach that otherwise language to it. And it seems pretty clear that the otherwise language would be doing something. So, well, of course, it is doing something on both sides, reading, and I think that it creates this new category. Yeah, yeah, yeah, you know what I mean. I do. But in that, in both of his excellent briefs, right, you won't find any dictionary definition anywhere of on sale. No engagement with the meaning of on sale. There's just a cross-reference to the government's brief. The government cites a dictionary that says that on sale means available for purchase by customers, and a customer is just someone who buys something. It certainly doesn't mean available in an open, you know, non-hidden way, and it doesn't mean available to the entire world. One sale to one willing purchaser has always been a validating sale. And I think that the reason for that, one reason for that, this Court brought out in FAF, is that it gives the inventor, him or herself, a degree of predictability. The inventor controls when she wants to place her invention on sale. If instead, if it were something more ambiguous that involved when the invention is not just sold by the inventor to a wholesaler or sold by the wholesaler to a retailer, but instead when it was placed on sale by the retailer at the end of the process. I'm sorry, given your position, you have the wrong answer to the brownies hypothetical, I think. So, if you, my answer to the brownies hypothetical is based on... As a term, it covers with nuts or without nuts, right? So I, I guess it, right, it depends... Maybe we lost the hypothetical. Yeah, right. I guess maybe I'm, maybe I'm misunderstanding the hypothetical, or at least maybe we're having a disagreement about what, what it means to be, to be a brownie. You were saying it was him. Yes. You were saying it's ambiguous. I'm saying that is not ambiguous, right? And you were saying on sale is not ambiguous. So I am saying that on sale is ambiguous. And I guess if you open the dictionary... You're saying it's not ambiguous, on sale. I'm saying that on sale is not ambiguous. It certainly was not ambiguous when, when chosen for continued inclusion in the AIA. Even though it says otherwise available to the public, it's still not ambiguous. Even though it says otherwise available to the public, it's still not ambiguous. That's right. Because it would take more than that. And I agree, I agree with Mr. Stewart when, when he answered this question. It would take more than that to unsettle the meaning of a term with such a lengthy history. That would be a very indirect way, as I think Your Honor brought out in your question in the top half of the argument, to accomplish that. So whatever the definition, dictionary definition of brownie may be, and I guess I've confessed I'm not up on that, I think that the meaning of on sale is sufficiently unambiguous. And it certainly is not the case that otherwise is some talismanic word that is used in statutes, you know, to unsettle the meaning of words that come before. And I think the best examples that we can give are the party or other activity that damages the house in Barnhart. Party, of course, is not even a term of art. Well, they cite the Perline case as an example of a case where a term, a statute was structured like this, and the term in the catch-all then was used to influence the interpretation of the preceding terms. Why is that different? It was used to the Court said it was used to, it summarized what the, you know, what the preceding terms did. It certainly wasn't used to change or unsettle a preexisting meaning. It's different for a couple of reasons. One, the Court said in Perline, number one, that it might well have reached the same conclusion even if that language didn't appear in the statute because of the strong presumption that remedial statutes contain a proximate cause element. And, you know, that is on page 446 of the opinion. And then on the next page, you'll see that the Court has a paragraph dealing with the other language, and it does two things. One, it treats it as a series modifier because it is equally applicable to each of the five categories that's come before. That was kind of like the argument that the other side was making in the court of appeals, that otherwise available to the public is a series modifier that actually modifies as a matter of English grammar the terms that come before it in the list. And they've abandoned that argument, and that's why we're not talking anymore about the rule of the last antecedent. And then the third thing was the point about summarizing the categories that come before. In this case, we just don't think that available to the public is a fair summary of on sale, either as a matter of ordinary English or as a matter of the specialized meaning that this Court has given it. And I think that Mr. Shamagam, you know, suggested that, you know, Judge Hand kind of created this, the policy behind the on-sale bar as being something about commercializing. But I think the history goes much further back than that, and I would urge the Court to look at a number of the late 19th century cases, such as Consolidated Fruit Jar, in which the Court said that the inventor is not allowed to derive any benefit from the sale or the use of his machine unless he begins, unless he applies for patenting within the then grace period. Mr. Jay, say we disagree with you, just for the purposes of this hypothetical, and think that the introduction of the otherwise clause introduced some ambiguity about what on sale means now. I understand the Patent Office has an interpretation of the statute. What should we do with that, if anything, or should we ignore it? I think that it would only be relevant if it had the power to persuade. This Court has never given deference to the Patent Office on substantive questions of patentability, on what it takes to overcome the bars put in the statute by Congress, where Congress has said you may not have a patent if X, Y, or Z. Now, this Court has any number of decisions in which it has held that a patent issued by the Patent Office in conformance with the patent, with the Office's then examination guidelines, were invalid. So we think it's entitled to respectful consideration, just as the government's amicus brief in this case is entitled to respectful consideration. But we respectfully disagree with it. We don't think that, particularly because it doesn't deal with the meaning of on sale. And in its attempt to reconcile that with the new language, its suggestion of this new test about availability to the public, meaning the ultimate consumer, that's not based in anything, text or definition or history or case law of any kind. So we think that a virtue of our position is that you don't need to get into the question of what it means to be available to the public when you're considering a sale, you don't need to get into the question of whether or not a sale is a concept that's been baked into the statute for a long time. Mr. Stewart urged the Court to look at a number of aspects of this transaction. And Mr. Shambhagam, in sort of the end of his four-part litany of why this invention was not available to the public, mentioned that this was a development agreement. Now, I would urge the Court to look at part one of the Federal Circuit's opinion, which deals with the question whether this was a sale at all. That's a pretty specific inquiry into whether the preconditions for the sale prevent it from being a sale, as that term is used and has been used for many, many years. The other side, of course, didn't seek certiorari on that question. We don't think it's properly before the Court. What they did seek certiorari on is bakes – if you look specifically at the question presented, it doesn't use available to the public. It refers specifically to secrecy, to the existence of a confidentiality agreement. You know, a third party that is obligated to keep the invention confidential. That's the only manifestation of not available to the public that they put in the question presented. And I think you've heard that, you know, the government's not defending that view. And we think that adopting that view, under which stickering an offer or a product with a confidentiality agreement, and thereby taking it off the table for purposes of the on-sale bar, would be an incredibly problematic view for a variety of reasons. One, it would be easy to do. Two, it would seriously undermine the purpose of the on-sale bar, because it would allow not just isolated commercialization, but really rampant commercialization. And then the third point about what it means to be available to the public, about whether this distributor should count, and this goes back to a question that Justice Sotomayor asked, about, you know, if you asked a consumer, you know, what would it mean to be on sale, I think if you ask a pharmaceutical company, what does it mean for your product to be on sale, what that pharmaceutical company would say is, we're selling it to a distributor. As we cited, and as we explained in our brief, 90 percent of the pharmaceuticals in this country are sold not directly from the manufacturer to a consumer, but to a wholesaler or a distributor. That's how they're sold. And so the implications of adopting this ultimate consumer test would be to give the pharmaceutical industry in particular, and any other industry that operates primarily through wholesalers and distributors, a real free pass from the on-sale bar, and that, getting back to the basic purpose of the bar, that would undermine the statutory term, right? As the Court said in FAFT, confining the duration of the monopoly to the statutory term is one of the two key principles of the underlying the on-sale bar. We think that because Helsin placed its invention on sale, and it was willing to, and that part three of the Federal Circuit's opinion explains why it was ready for patenting. So it had one year in which to apply for a patent. It chose not to do that. And then many years later, after the AIA was passed, it went back to the Patent Office and it tried to get, and it got a patent that would be subject to the AIA that was, as the Federal Circuit explained, indistinguishable from, for relevant purposes, materially indistinguishable from the pre-AIA patents that it had obtained. And it said that the sale that it invalidated, that was going to invalidate its prior, pre-AIA patents, doesn't invalidate this post-AIA patent. So I think it's difficult for Helsin to say that it's not withdrawing anything from the stock of knowledge by getting a patent. Kagan. Kagan. Mr. Jay, would the prior secret sale of an invention by somebody other than the patent holder invalidate the patent holder's patent? Jay. I think the answer is yes, but I've not seen cases like that because I think it would be exceptionally difficult to discover. Whereas the way that the sale in this case came to light and the way in which sales in patent cases generally come to light is through discovery from the inventor. You know, as the Court said in FAF, you want the inventor to have control about the timing and the choice to commercialize the invention. And so a rule that gives the inventor control over that necessarily has to leave out the possibility that someone else might also have the invention and start selling it, but that's not been an implementation problem in reality. If the Court has no further questions, I'm prepared to reveal back the balance of my time. Thank you, counsel. Mr. Shabnagam, you have four minutes remaining. Thank you, Mr. Chief Justice. Our fundamental submission today is a simple one. It is that the phrase on sale should not be read in a vacuum, but rather in the context of the surrounding language. And the fundamental problem and the dispositive problem I would respectfully submit with Mr. Jay's submission is that it really would read the word otherwise out of the statute. I think that the hypotheticals that were proffered to Mr. Jay make that clear, but let me, at the risk of introducing another one, point to this Court's decision in one of my favorite statutory interpretation cases, United States v. Standard Brewery. That is the case that involved the Wartime Prohibition Act, which prohibited the use of grains to manufacture in the language of the statute, quote, And believe it or not, there was actually a case in which a party was making non-intoxicating beer, and the question was whether the statute applied to that, and the Court said no, applying the very principles that we are articulating here. And the Court's rationale was that the qualifying words, other intoxicating in this Act cannot be rejected. In the words of Justice Day, if the intention was to include beer or wine, whether intoxicating or not, the use of this phraseology was quite superfluous. And I would respectfully submit that Mr. Jay really has no alternative way of reading the very familiar term otherwise. Mr. Jay today, as in his excellent brief, suggests that otherwise could be read to cover situations in which there is some overlap. We know that the public use bar and the on-sale bar have considerable overlap in many cases, but it would, of course, have been nonsensical for Congress to have said in public use or otherwise on sale. That doesn't make sense as a matter of basic English, and Respondents can point to none of this Court's many cases involving catch-all provisions that support that approach to the statute. Breyer. Breyer. You have a whole brief. I mean, you know, you have a brief. I mean, everybody's is excellent, okay? But the point is that there is a brief which gives the instance of an inventor who talks daily through the Internet or otherwise through 60,000 people, and he tells those 60,000 people about his invention. And that, they say, and similar or other circumstances, are what this last phrase is meant to cover. Now, that gives a meaning to it. Yes. Just as in standard brewery, right? That catch-all provision was presumably included for a reason, to include other malt or Venice beverages. That's always true of the catch-all provision. Sometimes, yes. Sometimes, no. And that would have been true with the catch-all provision in C-Train Lines, the catch-all provision in Paroline. And yet, these cases consistently make clear that these sorts of catch-all provisions identify a key characteristic that the preceding provisions should be understood to share. And we know from the legislative history that that was the better view of Congress's intent here. And while Respondents have this very convoluted explanation of the evolution of the statutory language, the one thing they can't point to is any legislative history that construes the final version of the AIA in the way that they suggest. Now, I want to say just a word about this contrary argument about on sale, which really relies on interpreting on sale in vacuo. I made the point in my opening argument that there are no cases of this Court that would come out differently under our interpretation. I did not hear Respondents 2 suggest differently. And, Justice Kagan, to the extent that you asked a question along these lines about, well, can we put together FAF in these Federal Circuit cases and get enough to get to some notion of ratification, our interpretation retains FAF. It retains both the holding of FAF, because I think that that was a case where there was availability of the public. It was a somewhat unusual product because it was a custom-made product. And so I think Texas Instruments really was the sum total of the relevant public. But I think the outcome would be the same. And our whole point about why Congress used this final formulation to respond to Justice Kavanaugh's questions on this point was to retain the existing jurisprudence surrounding the bars, and in particular with regard to FAF. FAF, as the Court will be aware, articulated the ready for patenting requirement. That is a requirement in our view that very much would continue to have force. The experimental use exception to which Mr. Stewart referred would also continue to have force. And that explains, I think, even the legislative history, the little bit of legislative history to which Respondent's point, and in particular Representative Lofgren's statement, because by retaining those phrases while adding the catch-all provision, Congress made clear that that jurisprudence should be retained. The judgment of the Federal Circuit should be reversed. Thank you. Roberts. Thank you, counsel. The case is submitted.